UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CLEMENTE A.[1] | ) |
| | ) No. 18 CV 6345 |
| Plaintiff, | ) |
| | ) |
| v. | ) Magistrate Judge Young B. Kim |
| | ) |
| | ) |
| ANDREW MARSHALL SAUL, | ) |
| Commissioner of Social Security, | ) |
| | ) August 22, 2019 |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Clemente A. seeks disability insurance benefits ("DIB"), claiming that he suffers from back, neck, and shoulder pain that prevents him from engaging in full-time work. In this lawsuit Clemente seeks judicial review of the Commissioner of Social Security's decision denying his DIB application. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross-motions for summary judgment. For the following reasons, Clemente's motion is denied, and the government's is granted:

**Procedural History**

Clemente applied for DIB in October 2014, alleging that he became disabled on March 3, 2012, when he was 48 years old. (Administrative Record ("A.R.") 218.) After his application was denied initially and upon reconsideration, (id. at 96, 113), Clemente sought and was granted a hearing before an administrative law judge

---

[1] Pursuant to Internal Operating Procedure 22, the court uses only the first name and the last initial of the plaintiff in this opinion to protect his privacy to the extent possible.

("ALJ"). Clemente appeared and testified at the hearing, after which the ALJ issued a decision finding him not disabled. (Id. at 22-30.) The Appeals Council denied Clemente's request for review, (id. at 1-3), making the ALJ's decision the final decision of the Commissioner, *see Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Clemente then filed this lawsuit, and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 6).

## Facts

In November 2011 Clemente was struck by a bus that was moving between five to seven miles per hour. (A.R. 360.) He fell and landed on his side, injuring his left shoulder. (Id. at 359.) A few months after the accident, Clemente stopped working as a construction worker, and he claims that his on-going shoulder, neck, and back pain has rendered him disabled.

**A. Medical Evidence**

The medical records Clemente submitted to the ALJ show that in the year following his accident he underwent two separate surgeries to repair his injured left shoulder. In March 2012 he had a rotator cuff repair surgery, (A.R. 412), followed by seven months of physical therapy, (id. at 436-610). After Clemente continued to suffer pain despite physical therapy and cortisone injections, he underwent a left shoulder arthroscopy procedure in October 2012. (Id. at 619.)

In the years following his second surgery Clemente sought treatment with an orthopedic specialist and pain specialists, who prescribed Vicodin and Norco for his pain. (See, e.g., id. at 623, 628, 633, 706-07.) Clemente also received steroid

injections. Throughout this time Clemente reported his pain levels in his neck and left shoulder as being between 5 and 8 on a scale of 1 to 10. (Id. at 709, 712, 718, 724, 745.) His doctors' examination notes show that he often had positive Yergason and Speed's tests (tests that measure for shoulder damage), and he exhibited a limited range of motion in his neck and tenderness in his left shoulder on palpation. (See, e.g., id. at 702, 704, 710, 713.) At the same time, his doctors recorded him as having normal muscle strength, normal sensory exams, and a normal gait. (Id. at 612, 655, 701-02, 710.) One pain specialist opined in November 2013 that Clemente had no specific structural issues with his shoulder but was experiencing chronic pain. (Id. at 655.)

In November 2014 Clemente underwent a residual functional capacity ("RFC") evaluation with a rehabilitation specialist, Joseph Santillo. Santillo reported that Clemente exhibited low levels of physical effort during the test and he found minor inconsistencies in Clemente's reports of pain and disability. (Id. at 855.) After putting Clemente through a series of tests, Santillo opined that Clemente's shoulder pain limits his lifting, pulling, pushing, and carrying abilities, but concluded that he would be able to perform sedentary work. (Id. at 856, 859.)

In February 2014 Clemente's doctor described him as stable taking two Norco a day, which helped with 60% to 70% of his pain, with no side effects and with no new complaints despite on-going back, neck, and shoulder pain. (Id. at 727.) A series of spine and shoulder MRIs taken in January 2015 showed mild tendinopathy in his left shoulder but no evidence of a labral tear. (Id. at 793.) Although the

lumbar spine MRI revealed moderate degenerative disc disease, there was no evidence of a compression fracture or other "destructive process." (Id. at 796.) In March 2015 an examining physician described Clemente as having normal muscle development without atrophy, no decreased range of motion in his spine, a negative straight leg test, 4/5 strength in his left upper extremity, and a slow but steady gait. (Id. at 833.)

The following month in April 2015, consulting physician Dr. Leonore Gonzalez reviewed Clemente's records and opined that his pain complaints were disproportionate to the objective evidence, given his minimal limitations on examination. (Id. at 94.) Based on her review of the evidence Dr. Gonzalez concluded that Clemente can perform light work with some lifting and carrying limitations. (Id. at 92-93.) A month later consulting physician Dr. Yacob Gawo also reviewed the records and concurred that Clemente is capable of light work with limitations in lifting and carrying, but he added limitations in pushing and pulling. (Id. at 108-10.)

**B.    Hearing Testimony**

Clemente testified that his pain has gotten worse over time despite his two surgeries. (A.R. 55-56.) He said that his neck pain runs down his arm to his wrist, causing a stabbing sensation and numbness in his hand. (Id. at 57.) Steroid injections typically provide only a week of relief. (Id.) Clemente testified that bending makes his pain worse and he is unable to sit or stand for extended periods. (Id. at 60.) He also testified that performing chores, tying his shoes, and bathing

4

causes pain. (Id. at 61-62.) He said that he can reach his left arm overhead but lifting anything is painful. (Id. at 62.)

A vocational expert ("VE") also testified at the hearing, describing the kinds of work that would be available to a hypothetical individual with various limitations described by the ALJ. The VE testified that a person with the RFC the ALJ eventually assigned to Clemente could not work as a construction worker but could perform other jobs, such as cafeteria attendant, laundry worker, and sales attendant. (Id. at 77-78.) The VE also testified that if the hypothetical individual would be off-task for more than 15% of the work day or if he needs to have a sit/stand option to accommodate his pain, those limitations would be work-preclusive. (Id. at 80-81.)

**C.     The ALJ's Decision**

The ALJ followed the standard five-step sequence in evaluating Clemente's DIB claim. *See* 20 C.F.R. § 404.1520(a). At steps one and two, the ALJ determined that Clemente has not engaged in substantial gainful activity since his alleged onset date and that he has severe impairments in the form of degenerative disc disease, osteoarthritis, and allied disorder. (A.R. 24.) At step three he concluded that none of those impairments meets any listed impairment, either singly or in combination. (Id.) Before turning to step four, the ALJ determined that Clemente has the RFC to perform light work with certain additional limitations, including that he can reach, push, or pull with his upper left extremity only occasionally. (Id. at 25.) Given that RFC the ALJ determined at step four that Clemente could not

return to his past relevant work, but based on the VE's testimony he found at step five that there are other jobs available that Clemente can perform. (Id. at 28-29.)

## Analysis

Clemente argues that the ALJ committed reversible errors by applying an incorrect standard in assessing Clemente's alleged symptoms, playing doctor in evaluating the treatment record, giving insufficient weight to the rehabilitation specialist's RFC opinion, and failing to account for the VE testimony regarding the impact of a sit/stand option or a 15% off-task rate on his ability to work. In reviewing the ALJ's decision, this court asks only whether the ALJ applied the correct legal standards and whether the decision has the support of substantial evidence. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Substantial evidence means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation and citations omitted). In conducting its "extremely limited" review this court must not "displace the ALJ's judgment" and is required to affirm an adequately supported decision even if reasonable minds could disagree as to the correct decision on disability. *See Stepp v. Colvin*, 795 F.3d 711, 718 (7th Cir. 2015) (internal quotations and citation omitted).

**A.      Symptom Assessment**

Clemente first argues that the ALJ's decision must be reversed because, according to him, the ALJ applied the wrong standard in evaluating his statements

6

about the extent of his pain. He points to boilerplate language, often included as a matter of course in ALJ decisions, which reads:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms *are not entirely consistent* with the medical evidence and other evidence in the record for the reasons explained in this decision.

(A.R. 26 (emphasis added).) It is the "not entirely consistent" phrase that provokes Clemente's objection. Clemente argues that under SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017), the ALJ only needs to consider the extent to which the claimant's statements "can reasonably be accepted as consistent" with the other evidence, and asserts that the ALJ's statement that Clemente's symptom statements are "not entirely consistent" shows that he held Clemente to an incorrectly high standard. (R. 16, Pl.'s Mem. at 6.)

Clemente cites two cases from this district, *Dunbar v. Berryhill*, No. 17 CV 6278, 2018 WL 4095094, at *3 (N.D. Ill. Aug. 28, 2018), and *Minger v. Berryhill*, 307 F. Supp. 3d 865, 871 (N.D. Ill. 2018), for the proposition that the "not entirely consistent" boilerplate represents an incorrect legal standard, but neither squarely supports his argument. (See R. 16, Pl.'s Mem. at 6-7.) *Dunbar* does not provide Clemente with solid footing because there, despite criticizing the challenged language, the court explicitly refused to consider or resolve whether deployment of this particular boilerplate amounts to a legal error, emphasizing that "it makes no finding on the merits of Plaintiff's claim" in that regard. *Dunbar*, 2018 WL

7

4095094, at *4 & n.3. By contrast in *Minger* the court weighed in on the argument. The *Minger* court noted that the "not entirely consistent" language suggested that the ALJ applied an incorrect standard when evaluating the claimant's credibility and concluded that the narrative explanation from the ALJ supporting the analysis could not rescue it. *Minger*, 307 F. Supp. 3d at 872. Nevertheless, the *Minger* court then went on to point out several errors in how the ALJ had assessed the claimant's daily activities and work record to support its conclusion that the case must be remanded. *Id.* at 872-73.

Although this court agrees that the "not entirely consistent" boilerplate could be interpreted to reflect an incorrect standard, in the current context at least, the court is unwilling to say that its inclusion necessarily represents a fatal flaw, for several reasons. First, courts in this district have concluded in several decisions that were issued after the *Minger* decision that even though the language is problematic, it should be treated as the Seventh Circuit treats other examples of boilerplate, meaning the court will overlook the problematic phrase so long as the ALJ provides a sufficient explanation for how the claimant's statements were weighed. *See, e.g., Mendel R. v. Berryhill*, No. 17 CV 5407, 2019 WL 1858510, at *8 (N.D. Ill. April 25, 2019); *Joe R. v. Berryhill*, 363 F. Supp. 3d 876, 883-84 (N.D. Ill. 2019); *Dawn P. v. Berryhill*, No. 17 CV 4707, 2019 WL 339603, at *4 (N.D. Ill. Jan. 28, 2019). Second, the Seventh Circuit has treated similar "not entirely credible" boilerplate language as run-of-the-mill template language, upholding those

8

decisions so long as they are fully explained.[2] *See, e.g., Hammerslough v. Berryhill*, 758 Fed. Appx. 534, 539 (7th Cir. 2019); *Lafayette v. Berryhill*, 743 Fed. Appx. 697, 699 (7th Cir. 2018).

Finally, the Seventh Circuit has made clear that the court may not "nitpick" an ALJ's credibility decision but must give the whole decision a "commonsensical reading" and reverse only when the symptom assessment is "patently wrong." *See Jones*, 623 F.3d at 1160. Deploying the required holistic reading here, it is clear that the ALJ did not demand 100% consistency between Clemente's testimony and the record. Instead the ALJ reasonably compared Clemente's assertions to the objective medical evidence, including examination results that were generally unremarkable and that noted full strength and a lack of sensory deficits despite Clemente's complaints of weakness and numbness. (A.R. 26-27.) The ALJ pointed out that in at least one examination the doctor observed Clemente to be "hypersensitive" to palpation of the shoulder despite good resistance and range of motion in the same shoulder. (Id. at 26.) The ALJ noted that Clemente frequently reported to doctors that his medications improved his pain, which was inconsistent with his testimony of limited to no improvement. (Id. at 27.) Most importantly, it is clear that the ALJ did not require Clemente's testimony to be "entirely consistent" with the medical record because the ALJ modified the RFC to accommodate his

---

[2] The court also notes that the Seventh Circuit has affirmed cases in which the "not entirely consistent" language appeared in an ALJ's decision without sounding any alarm that the boilerplate is fatally incorrect. *See, e.g., Cooley v. Berryhill*, 738 Fed. Appx. 877, 880 (7th Cir. 2018); *Reed v. Colvin*, 656 Fed. Appx. 781, 786 (7th Cir. 2016).

9

allegations of pain and reduced strength in his left shoulder. This points to the conclusion that the ALJ intended the "not entirely consistent" phrase to articulate his characterization of the evidence, rather than the applicable legal standard. That conclusion is also supported by the ALJ's use of the correct legal standard, "reasonably . . . consistent with the objective medical evidence and other evidence," at the start of his articulation of the applicable legal standards. (Id. at 25.) For these reasons, the court declines to find that the ALJ's boilerplate language taints the decision with legal error or undermines the entirety of the otherwise-supported symptom assessment in this case.

Turning to Clemente's secondary challenge to the ALJ's symptom assessment, he argues that the ALJ impermissibly "played doctor" by interpreting medical information and concluding that the record does not reflect the kind of treatment one might expect if Clemente's pain were as severe as he claims. (R. 16, Pl.'s Mem. at 7.) But Clemente does not point to any language in the ALJ's decision to support that assertion, and the court detects no examples of the ALJ impermissibly jumping to medical conclusions or independently interpreting medical data. Clemente asserts that the ALJ had "no alternative opinion to that of a rehabilitation specialist," (id. at 8), but the record includes the opinions of two consulting physicians who considered him capable of light work. Clemente seeks to undermine those opinions because the consulting physicians did not review the rehabilitation specialist's opinion, but the rehabilitation specialist's RFC opinion

10

pre-dated the consulting physicians' review, and it was Clemente's burden to ensure that his file included all relevant records. *See Joe R.*, 363 F. Supp. 3d at 886.

Contrary to Clemente's argument, here the ALJ complied with his obligation to evaluate all of the available medical evidence and opinions and properly weighed those against Clemente's statements in coming to a credibility assessment. The ALJ also properly engaged with many of the factors set out in SSR 16-3p. The ALJ noted the location of his pain and how it impacts his ability to do things like twist, bend, and stand. (A.R. 26.) The ALJ also noted the medications Clemente takes and his reports that they induced no major side effects, and he considered other treatments like physical therapy. (Id. at 27.) Clemente faults the ALJ for omitting any discussion of his daily activities, but the ALJ engaged with enough of the factors to support his determination. *See Collins v. Colvin*, No. 14-cv-00466-DML-JMS, 2015 WL 5775224, at *4 (S.D. Ind. Sept. 30, 2015) ("It is *not* necessary that the ALJ recite findings on every factor listed in [the relevant SSR], or that he discuss every piece of evidence that might bear on credibility, or even that he specify exactly which of the claimant's statements he finds not credible." (emphasis in original)). Accordingly, Clemente has not shown that the ALJ's credibility assessment was "patently wrong" or legally deficient in a way that would mandate reversal. *See Burmester*, 920 F.3d at 510.

## B.     The RFC Assessment

Clemente also argues that the ALJ's RFC assessment is unsupported because, according to him, the ALJ improperly weighed the medical opinions and

11

failed to properly analyze the VE's testimony with respect to the impact of a sit/stand option or off-task time. Starting with the latter argument, contrary to Clemente's assertions in his brief, (R. 16, Pl.'s Mem. at 12), when the VE testified that a hypothetical individual who needs a sit/stand option could not work, he was responding to questions posed by Clemente's attorney, not the ALJ, (A.R. 81). There is no indication that the ALJ ever contemplated a sit/stand option to be a limitation that Clemente's RFC would require. As explained above, the ALJ gave supported reasons for discounting Clemente's allegations that his ability to sit and stand was restricted beyond the limitations in the RFC. (Id. at 26.) Clemente argues that the ALJ "should have adopted the limits of the functional capacity evaluation" submitted by Santillo, the rehabilitation specialist, (R. 16, Pl.'s Mem. at 13). But Santillo considered Clemente capable of meeting the static and dynamic standing and the sitting and walking requirements for his previous construction worker job and did not find that Clemente requires a sit/stand option, (A.R. 855-56). Given that evidence and because the sit/stand limitation was one raised only by Clemente's attorney, the ALJ did not err in failing to explain why he excluded a sit/stand option from the RFC.

By contrast the ALJ did ask the VE how adding a 15% off-task limitation to the hypothetical RFCs would impact available work, but he ultimately concluded that off-task requirements were not among Clemente's limitations. The Seventh Circuit has made clear that the ALJ is only required to include limitations that are supported by the record in the hypotheticals posed to the VE and in the RFC

assessment. *See Schmidt v. Astrue*, 496 F.3d 833, 846 (7th Cir. 2007). Clemente nevertheless argues that under *Winsted v. Berryhill*, 923 F.3d 472 (7th Cir. 2019), the ALJ should have explained why he did not include in the RFC a limitation for off-task behavior after soliciting testimony from the VE with respect to that limitation. But Clemente's argument appears to rest on an earlier version of *Winsted* that the Seventh Circuit amended and superseded after Clemente filed his opening brief. In *Winsted*, the court reviewed a decision in which the ALJ concluded that the claimant had moderate limitations in concentration, persistence, and pace, but did not include those limitations in the hypothetical posed to the VE, instead included limitations to simple, repetitive tasks. *Id.* at 476-77. The *Winsted* court ruled that the ALJ erred because a hypothetical restriction to simple, repetitive tasks does not capture concentration, persistence, and pace problems. *Id.* at 477. The court also noted that the ALJ had asked the VE about being off-task for 20% of the work day but did not include in the decision the VE's response that such a limitation is work-preclusive. In the original version of *Winsted*, the court wrote, "[b]ut [the VE's] responses are not reflected in the ALJ's decision, which means it cannot stand." *Winsted*, 915 F.3d at 471-72 (superseded by *Winsted v. Berryhill*, 923 F.3d 472 (7th Cir. 2019)). Clemente thus argues here that the ALJ's decision must be reversed because he did not include an off-task limitation in the RFC or explain its exclusion after soliciting testimony on that limitation from the VE.

After Clemente filed his opening brief, the Seventh Circuit amended *Winsted* and changed the language on which Clemente relies. After noting that the ALJ did

13

not include the VE's responses with respect to off-task time, the court amended its language to say that "[b]ecause the ALJ did not include Winsted's difficulties with concentration, persistence, and pace in the hypothetical he *did* consider, the decision cannot stand." *Winsted*, 923 F.3d at 477 (emphasis in original). The court thus made clear that the reversible error was the ALJ's failure to include the concentration, persistence, or pace limitations in the hypothetical that eventually formed the basis for the RFC despite finding the claimant had those limitations, not that the ALJ failed to include in the RFC every limitation the VE discussed. Here the ALJ included in the hypothetical to the VE all of the limitations that he eventually assigned to Clemente. And under the amended version of *Winsted*, the ALJ was not required to discuss every response the VE gave to hypotheticals the ALJ ultimately discarded.

Finally, Clemente argues that the ALJ erred in giving greater weight to the opinions of two consulting physicians than he did to the opinion of Santillo, the rehabilitation specialist who examined Clemente. The ALJ explained that he gave consulting physicians' opinions "great weight" because he considered them to be consistent with the medical record as a whole and assigned Santillo's opinion only "some weight" because a rehabilitation specialist is an "other source" rather than an acceptable medical source under the applicable regulations and he examined Clemente only once. (A.R. 27-28.) An ALJ is entitled to rely more heavily on a consulting physician than on an examining nonmedical source where he finds the consulting physician's opinion to be better supported by the record, so long as he

14

adequately explains that choice. *See* 20 C.F.R. § 404.1527(f)[3]; *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) ("[A]n ALJ is not required to credit the agency's examining physician in the face of a contrary opinion from a later reviewer or other compelling evidence."). Indeed, the applicable regulations do not require the ALJ to defer to the opinion of a nonmedical source, but rather direct the ALJ to consider criteria such as supportability, frequency of examination, and consistency with the record in weighing consulting and other source opinions. *See id.* § 404.1527(c), (f). That is what the ALJ did here. He reviewed the consulting physicians' opinions and adequately explained why he believed the medical evidence was more consistent with a limitation to work at the light rather than the sedentary level. (A.R. 27.) The ALJ noted that Santillo's RFC opinion was based on a single examination and noted in closing that the consulting physicians' opinions were aligned with the medical evidence and the objective findings of two treating doctors. (Id. at 28.) Although the ALJ could have offered more information here to compare and contrast the consulting physicians' and examining source's opinions, a commonsense reading of the ALJ's opinion as a whole provides an adequate picture of why the ALJ concluded that the limitation to light work is better supported. *See Winsted*, 923 F.3d at 478. Accordingly, the court finds his explanation with respect to the competing opinions sufficiently supported by substantial evidence.

---

[3] Although the rules for weighing medical opinions have changed for disability claims filed beginning March 27, 2017, *see* 20 C.F.R. § 404.1520c, because Clemente filed his application before that date the rules set out in 20 C.F.R. § 404.1527 still apply to the ALJ's decision here.

15

## Conclusion

For the foregoing reasons, Clemente's motion for summary judgment is denied, the government's is granted, and the decision denying Clemente's DIB application is affirmed.

**ENTER:**

_____
**Young B. Kim
United States Magistrate Judge**